UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 JUL 14 PH 4: 42

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| JONATHAN NELSON, Derivatively on Behalf of THE SHAW GROUP INC., <br><br> Plaintiff, <br><br> vs. <br><br> J. M. BERNHARD, JR., T. A. BARFIELD, JR., L. LANE GRIGSBY, JOHN W. SINDERS, JR., ALBERT D. MCALISTER, DAVID W. HOYLE, CHARLES E. ROEMER, III, JAMES F. BARKER, ROBERT L. BELK, RICHARD F. GILL and MITCHELL A. RAYNER, <br><br> Defendants, <br><br> -and- <br><br> THE SHAW GROUP INC., a Louisiana corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br> Section |

**04-1986**
**SECT. I MAG. 2**

DEMAND FOR JURY TRIAL

## VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

### I.

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right of, and for the benefit of, nominal defendant The Shaw Group Inc. ("Shaw Group" or the "Company") against its Board of Directors (the"Board") and certain top officers to remedy defendants' breaches of fiduciary duties and other violations of law which have inflicted millions of dollars in damages upon Shaw Group's reputation, goodwill and standing in the business community and have exposed it to millions of dollars in potential liability for violations of state and federal law and have subjected the Company

Fee $150 ºº
Process
X Dktd
CtRmDep
Doc. No.

to a Securities and Exchange Commission ("SEC") investigation concerning the Company's improper accounting practices. This action arises out of defendants causing Shaw Group to report improper financial results to the SEC and the investing public and issue improper press releases between October 19, 2000 and June 10, 2004 (the "Relevant Period"). Defendants' misconduct has caused severe, irreparable injury and damages to the Company, particularly to its reputation and goodwill in the investment and business community, and had subjected it to enormous liability for violations of federal and state law as well as subjecting it to a SEC investigation and causing the Company to lose of $136 million in market capitalization in a single day.

## II.

## SUMMARY OF THE ACTION

2.    Shaw Group is a global provider of services to the power, process and environmental and infrastructure industries. The Company is a vertically integrated provider of engineering, procurement, pipe fabrication, construction and maintenance services to the power and process industries. It also provides services to the environmental, infrastructure and homeland security markets, including consulting, engineering, construction, remediation and facilities management services to governmental and commercial customers. Effective February 28, 2003, the Company reorganized its operations into three operating segments: Engineering, Construction and Maintenance ("ECM"); Environmental and Infrastructure ("E&I") and Fabrication, Manufacturing and Distribution.

3.    During the Relevant Period, defendants made improper statements about Shaw Group's finances, prospects and acquisitions. As a result of these improper statements, Shaw Group's stock traded at artificially inflated prices, trading as high as $62.37 in April of 2001 (all share and per share amounts are adjusted to reflect Shaw Group's 2-for-1 stock split in December of 2000). Certain defendants took advantage of this inflation by selling over $65 million worth of their personal Shaw Group holdings. In addition, defendants caused the Company to accomplish two secondary offerings of Shaw Group stock, raising more than $215 million in net proceeds which will

2

subject the Company to strict liability under the Securities Act of 1933 by issuing a Registration Statement and Prospectus in connection with the offering of the securities which contained untrue statements of material fact and omitted to state material facts necessary to make these statements not misleading.

4.      The positive statements about Shaw Group's business during the Relevant Period were improper when issued.  The true but concealed facts were:

(a)      Shaw Group was prematurely recognizing income in violation of Generally Accepted Accounting Principles ("GAAP") by releasing acquisition-related contract reserves into earnings, boosting its profit by $200 million over three and a half years.

(b)      Shaw Group's business was not performing as well as represented and a significant number of its contracts were not profitable, which it was concealing through accounting manipulations, including improperly accelerating revenue recognition under the percentage-of-completion method of accounting.

5.      Indeed, on June 10, 2004, it was revealed that the SEC was investigating Shaw Group's accounting for purchases.  On that date, after the close of the market, the defendants caused the Company to issue a press release entitled, "Shaw Group Reports Informal SEC Inquiry." The press release stated in relevant part:

> The Shaw Group Inc. reported today that on June 1, 2004, Shaw was notified by the Securities and Exchange Commission (SEC) that it is conducting an informal inquiry. The SEC has not advised the Company as to either the reason for the inquiry or its scope.  However, the request for the information appears to primarily relate to the purchase method of accounting for acquisitions, as presented in Shaw's Form 10-K for the fiscal year ended August 31, 2003.

6.      On this news, shares of the Company's stock dropped from a closing price of $12.28 on June 10, 2004 to a closing price of $10.05 per share on the next trading day, June 14, 2004 on a volume of 4.2 million shares, nearly six times the daily average, and  representing a decline of over 18% and erasing over $136 million in the Company's market capitalization.

7.      As a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations of the nation's securities laws and

regulations and has been named in numerous federal securities class action lawsuits filed in the United States District Court for the Eastern District of Louisiana, on behalf of investors who purchased Shaw Group's shares. These lawsuits allege that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby. These suits will cost the Company millions to defend and possible tens of millions to resolve.

## III.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

9.      This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in the Court because nominal defendant Shaw Group conducts business in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## IV.

### PARTIES

11.     Plaintiff Jonathan Nelson, a citizen of the State of Hawaii, is and was at relevant times complained of herein, a shareholder of nominal defendant Shaw Group.

12.     Nominal defendant Shaw Group is a Louisiana corporation with its principal executive offices located at 4171 Essen Lane, Baton Rouge, LA, 70809.

4

13.     Defendant J. M. Bernhard, Jr. ("Bernhard"), Shaw Group's founder, is, and at all relevant times hereto was, a director, Chief Executive Officer ("CEO"), Chairman of the Board and a member of Shaw's Group Executive Committee. Bernhard is a citizen of Louisiana. As an officer and director of Shaw Group, Bernhard owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as its CEO and a member of its Executive Committee, Bernhard had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Bernhard owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his wrongdoing, Bernhard has been named as a defendant in numerous securities fraud lawsuits brought against the Company by its shareholders. Bernhard certified the Company's false financial statements filed with the SEC during the Relevant Period including its Form 10-Q's and signed the Company's false and misleading Annual Reports on Form 10-K for Fiscal Years ("FY") FY:01, FY:02 and FY:03 and therefore Bernhard is a direct participant in the wrongdoing. For FY:03, FY:02 and FY:01, the Company paid Bernhard $950,000, $953,482 and $941,667 respectively in salary, and paid for FY:02 and FY:01 paid him $1,000,000 and $2,000,000, respectively in bonuses. According to the Company's most recent Proxy Statement, as of August 31, 2003, Bernhard owned 800,000 Shaw Group options including 100,000 which are not vested. Pursuant to the Company's 2001 Employee Incentive Compensation Plan, if Bernhard's employment is terminated, he will forfeit these non-vested options. Moreover, during the Relevant Period, while in possession of undisclosed adverse information about Shaw Group, Bernhard sold 1,510,000 shares of his Shaw Group stock for proceeds of $58,851,344. By virtue of his executive positions with Shaw Group, his massive stock sales during the Relevant Period, his status as a named defendant in the securities fraud class actions, his longer term personal,

professional and financial relationships with the other members of the Shaw Group Board, his substantial ownership of Shaw Group options, and his personal participation in the underlying misconduct, Bernhard is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

14.     Defendant T. A. Barfield, Jr. ("Barfield") is, and at all relevant times hereto was, employed with the Company and, since September 2003, has served as its President, Chief Operating Officer ("COO") and a director. Barfield is a citizen of Louisiana. As an officer and director of Shaw Group, Barfield owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as its President and COO, Barfield had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Barfield owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his wrongdoing, Barfield has been named as a defendant in numerous securities fraud lawsuits brought against the Company by its shareholders.   Barfield signed the Company's false and misleading Annual Reports on Form 10-K for FY:03. By virtue of his executive positions with Shaw Group, his status as a named defendant in the securities fraud class actions, his longer term personal, professional and financial relationships with Bernhard the other members of the Shaw Group Board and his personal participation in the underlying misconduct, Barfield is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

15.     Defendant L. Lane Grigsby ("Grigsby") is, and at all relevant times hereto was, a director of Shaw Group and since  FY:03 has served on the Company's Nominating and Corporate

6

Governance Committee. Grigsby is a citizen of Louisiana. As a director of Shaw Group, Grigsby owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a director and member of its Nominating and Corporate Governance Committee, Grigsby had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company, particularly as a member of the Nominating and Corporate Governance Committee with implementing and advising the Board of appropriate corporate governance practices. Rather than fulfill these important fiduciary duties Grigsby owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Grigsby signed the Company's false and misleading Annual Reports on Form 10-K for FY:03, FY:02 and FY:01. Moreover, during the Relevant Period, while in possession of undisclosed adverse information about Shaw Group, Grigsby sold 16,000 shares of his Shaw Group stock for proceeds of $666,400. Grigsby is the majority owner and Chairman of Cajun Constructors, Inc., which the Company has used on certain projects, primarily as a subcontractor. Grigsby also had a minority interest in a company that provided services to the contractor of the Company's leased building. During FY:02, the Company made total payments of approximately $20,825,000 to these two companies in which Grigsby had an interest and paid them approximately $266,000 during FY:01. By virtue of his positions with Shaw Group, his business dealings with the Company, his stock sales during the Relevant Period, his longer term personal, professional and financial relationships with Barfield and other members of the Shaw Group Board and his personal participation in the underlying misconduct, Grigsby is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

16.     Defendant John W. Sinders, Jr. ("Sinders") is, and at all relevant times hereto was,

7

a director of Shaw Group and since FY:03 has served on the Company's Nominating and Corporate Governance Committee and during the Relevant Period served on its Audit Committee. Sinders is a citizen of Texas.  As a director of Shaw Group, Sinders owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a director and member of its Nominating and Corporate Governance and Audit Committees, Sinders had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company, particularly as a member of the Nominating and Corporate Governance Committee with implementing and advising the Board of appropriate corporate governance practices; and as member of its Audit Committee with ensuring the integrity of the Company's financial statements including ensuring that they complied with GAAP, ensuring the Company's compliance with all legal and regulatory requirements, overseeing the Company's systems of internal accounting and financial controls, and with ensuring the performance of the Company's internal audit function. Rather than fulfill these important fiduciary duties Sinders owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Sinders signed the Company's false and misleading Annual Reports on Form 10-K for FY:03, FY:02 and FY:01. Moreover, as a member of the Audit Committee, Sinders approved the Company's improper financial statements and therefore Sinders is a direct participant in the wrongdoing. Sinders was formerly a managing director of Jefferies & Company, Inc. ("Jefferies"), an investment banking firm when Jefferies handled the repurchase of some of the shares of the Company's common stock which earned Jefferies approximately $74,000 in commissions. Sinders was also a managing director of RBC Dominion Securities Corporation ("RBC"), also an investment banking firm, when (1) RBC was one of the managing underwriters for the Company's November 1999 public offering of shares of common stock earning RBC approximately $150,000 in commissions; and (2) RBC was a

8

participating underwriter for the Company's October 2000 public offering of shares of common stock earning RBC approximately $44,000. By virtue of his positions with Shaw Group, his business dealings with the Company, his longer term personal, professional and financial relationships with Barfield and other members of the Shaw Group Board and his personal participation in the underlying misconduct, Sinders is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

17.     Defendant Albert D. McAlister ("McAlister") is, and at all relevant times hereto was, a director of Shaw Group, currently a member of its Executive and Compensation Committees and during FY:02 and FY:01 served on its Audit Committee. McAlister is a citizen of South Carolina. As a director of Shaw Group, McAlister owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a director and member of its Executive, Compensation and Audit Committees, McAlister had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company, particularly as member of its Audit Committee with ensuring the integrity of the Company's financial statements including ensuring that they complied with GAAP, ensuring the Company's compliance with all legal and regulatory requirements, overseeing the Company's systems of internal accounting and financial controls, and with ensuring the performance of the Company's internal audit function; and as member of its Executive Committee managing the day-to-day affairs of the Company. Rather than fulfill these important fiduciary duties McAlister owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. McAlister signed the Company's false and misleading Annual Reports on Form 10-K for FY:03, FY:02 and FY:01. During the Relevant Period, while in possession of undisclosed adverse information about Shaw

9

Group, McAlister sold 10,000 shares of his Shaw Group stock for proceeds of $480,760. Moreover, as a member of the Audit Committee, McAlister approved the Company's improper financial statements and therefore McAlister is a direct participant in the wrongdoing. By virtue of his positions with Shaw Group, his stock sales during the Relevant Period, his longer term personal, professional and financial relationships with Barfield and other members of the Shaw Group Board and his personal participation in the underlying misconduct, McAlister is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

18.    Defendant David W. Hoyle ("Hoyle") is, and at all relevant times hereto was, a director of Shaw Group, currently a member of its Executive Committee and since FY:03 has served on its Audit Committee. Hoyle is a citizen of North Carolina. As a director of Shaw Group, Hoyle owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a director and member of its Executive Audit Committees, Hoyle had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company, particularly as member of its Audit Committee with ensuring the integrity of the Company's financial statements including ensuring that they complied with GAAP, ensuring the Company's compliance with all legal and regulatory requirements, overseeing the Company's systems of internal accounting and financial controls, and with ensuring the performance of the Company's internal audit function; and as member of its Executive Committee managing the day-to-day affairs of the Company. Rather than fulfill these important fiduciary duties Hoyle owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Hoyle signed the Company's false and misleading Annual Reports on Form 10-K for FY:03, FY:02 and FY:01. During the Relevant Period, while in possession of undisclosed adverse information

about Shaw Group, Hoyle sold 10,000 shares of his Shaw Group stock for proceeds of $451,955. Moreover, as a member of the Audit Committee, Hoyle approved the Company's improper financial statements and therefore Hoyle is a direct participant in the wrongdoing.  Hoyle has been a member of the Senate Chamber for the North Carolina General Assembly since 1992. By virtue of his positions with Shaw Group, his stock sales during the Relevant Period, his status as an elected official, his longer term personal, professional and financial relationships with Barfield and other members of the Shaw Group Board and his personal participation in the underlying misconduct, Hoyle is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

19.      Defendant Charles E. Roemer, III ("Roemer") is, and has been a director of Shaw Group since January 2003 and a member of its Compensation Committee. Roemer is a citizen of Louisiana.  As a director of Shaw Group, Roemer owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a director and member of its Compensation Committee, Roemer had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company.  Rather than fulfill these important fiduciary duties Roemer owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Roemer signed the Company's false and misleading Annual Reports on Form 10-K for FY:03.  Roemer served as Governor of the State of Louisiana from 1988 to 1992 and in 1980 was elected to the United States Congress to represent the 4th Congressional District of Louisiana and served in that position for seven years. By virtue of his positions with Shaw Group, his past status as an elected official including the Governor of Louisiana, his longer term personal, professional and financial relationships with Barfield and other members of the Shaw Group Board and his personal participation in the underlying misconduct, Roemer is

not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein against himself and his fellow directors.

20.     Defendant James F. Barker ("Barker") is, and has been a director of Shaw Group since his election to the Board at the Company's last annual meeting on January 30, 2004. Barker is a citizen of South Carolina. As a director of Shaw Group, Barker owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a director Barker had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Barker owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Despite Barker knowledge of the Company's improper accounting and improper financial statements and press releases and SEC investigation, Barker has not filed any lawsuits against any of the other defendants for the claims asserted herein demonstrating his lack of independence. Moreover, Barker is President of Clemson University. According to the University's website, defendant McAlister and his wife are major contributors to Clemson, having donated between $100,000 and $249,999 to the University.  Thus, Barker would never institute a lawsuit for the claims asserted herein against McAlister.

21.     Defendant Robert L. Belk  ("Belk") was, at all relevant times hereto, Chief Financial Officer ("CFO"),  Executive Vice President and Treasurer of Shaw Group. Belk is a citizen of Louisiana.  As a officer of Shaw Group, Belk owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as CFO, Executive Vice President and Treasurer, Belk had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company, particularly as CFO with ensuring the integrity of the Company's

financial statements including ensuring that they complied with GAAP. Rather than fulfill these important fiduciary duties Belk owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Belk signed and certified Company's false and misleading Form 10-Q's during the Relevant Period. During the Relevant Period, while in possession of undisclosed adverse information about Shaw Group, Belk sold 35,000 shares of his Shaw Group stock for proceeds of $1,463,700.

22.     Defendant Richard F. Gill ("Gill") is, and has been employed by the Company in various positions since 1997 including serving as Executive Vice President and Chairman of the Company's non-director Executive Committee since September 2003 and served as the Company's COO until September 2003. Gill is a citizen of Louisiana. As an officer of Shaw Group, Gill owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as COO and Executive Vice President and Chairman of the Company's non-director Executive Committee, Gill had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company, particularly as Executive Vice President and Chairman of the Company's non-director Executive Committee with the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Gill owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, while in possession of undisclosed adverse information about Shaw Group, Gill sold 60,000 shares of his Shaw Group stock for proceeds of $2,285,000.

23.     Defendant Mitchell A. Rayner ("Rayner") was, at all relevant times hereto, Senior Vice President of Fabrication and Manufacturing until March 2002 when he was named Executive

13

Vice President of Operations for the Company. Rayner is a citizen of Louisiana. As a officer of Shaw Group, Rayner owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as Executive Vice President of Operations, Rayner had also assumed important managerial responsibilities at Shaw Group which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Rayner owed to Shaw Group and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Shaw Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, while in possession of undisclosed adverse information about Shaw Group, Rayner sold 40,000 shares of his Shaw Group stock for proceeds of $1,620,400.

24.     The defendants identified above in ¶¶13-23 are collectively referred to hereinafter as the "Individual Defendants." For demand futility purposes, the defendants identified in ¶¶13-20, who made up the Board at the time this action was instituted, are collectively referred to sometimes as the "Director Defendants." The defendants identified in ¶¶13, 15, 17-18, 21-23, are collectively referred to sometimes as the "Insider Selling Defendants."

## V.

## FACTS

25.     Shaw Group is a global provider of services to the power, process and environmental and infrastructure industries. The Company is a vertically integrated provider of engineering, procurement, pipe fabrication, construction and maintenance services to the power and process industries. It also provides services to the environmental, infrastructure and homeland security markets, including consulting, engineering, construction, remediation and facilities management services to governmental and commercial customers.

26.     Bernhard formed National Fabricators in 1986. After visiting the Benjamin F. Shaw Company's plant in South Carolina to bid on its inventory, he established Shaw Group in 1987 and

14

bought the 100-year-old maker of power-station piping systems. From 1988 to 1990 Shaw Group expanded its business by leasing three plants in Louisiana and Texas. The Company bought a plant in 1992.

27.    Shaw Group formed a joint venture with Venezuela-based Formiconi in 1993 to open a plant there. The Company began making pipes for chemicals and oil refining with its purchase of Sunland Fabricators. Shaw Group also went public that year. Shaw Group expanded plant capacity and added more induction bending machines to its inventory in 1996 and 1997. It purchased NAPTech (industrial piping systems) in 1997. In 1999 Shaw Group won a five-year contract to supply 90% of the piping for General Electric's gas turbines for power plants. In 2000 Shaw Group signed a letter of intent with a U.S. power developer to build a $380 million power plant in central Texas. It also created EntergyShaw, a joint venture with Entergy Corporation, to build cookie-cutter power plants in North America and Europe in hopes of driving down costs and speeding construction time. That year the Company purchased Stone & Webster, Inc. ("Stone & Webster"), for about $38 million and approximately 2.5 million shares of stock.

28.    The Individual Defendants wished to make additional acquisitions and to sell additional shares to the public. It was essential to this plan to report favorable financial results so that its stock would trade at higher levels to make the offerings and acquisitions possible. Unfortunately, Shaw Group's contracts were not sufficiently profitable for defendants to show the growth the market expected. Thus, the Individual Defendants used artificial means to report favorable results, including using excessive reserves in connection with purchase acquisitions to inflate subsequent reported earnings and improperly accelerating revenue recognition under the percentage-of-completion method.

**IMPROPER STATEMENTS
DURING THE RELEVANT PERIOD**

29.    On October 19, 2000, the Individual Defendants caused the Company to announce its 4Q:00 and FY:00 financial results (Shaw Group's fiscal year ends on August 31). The press release entitled, "The Shaw Group Announces Increases in Sales and Earnings for Fourth Quarter

15

and Fiscal Year 2000," and reported that Shaw Group had 4Q:00 net income of $10.2 million, or

$0.30 per share, up 77% from earnings of $5.8 million, or $0.23 per share, in the 4Q:00. For the full

fiscal year, the Company reported net income of $30.4 million, or $0.98 per share, compared to

earnings of $18.1 million, or $0.73 per share in FY99. The press release stated in relevant part:

> J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, stated, "This has been an exceptional year to add to our solid track record of growth. Our management team was at its best, and our employees at every level should be commended for their commitment to our success. The integration of Stone & Webster is progressing as we had hoped, and we expect to begin adding projects from EntergyShaw into our backlog by the end of the calendar year. As we move into fiscal 2001, we will continue to act strategically and opportunistically, with an inherent focus on bringing additional value to our shareholders."

30.    On January 11, 2001, the Individual Defendants caused the Company to issue a press

release announcing its financial results for the 1Q:01 ended November 30, 2000. The press release

entitled, "The Shaw Group Inc. Announces Increases in Sales and Earnings for the Fiscal Quarter

of Fiscal 2001; Backlog Reaches $2.1 Billion," stated in relevant part:

> The Shaw Group Inc. today announced a 109% increase in earnings to $12.2 million, or $0.31 per diluted share, for the first quarter ended November 30, 2000. This compares to $5.8 million in earnings before a change in accounting principle, or $0.22 per diluted share, for the three months ended November 30, 1999. These results reflect a two for-one common stock split that was effective on December 15, 2000. The Company also announced an increase in sales for the first quarter of fiscal 2001 to $418.8 million, representing a 178% increase over the prior year's first quarter sales of $150.8 million.

> \* \* \*

> J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, stated, "With solid results posted for the first quarter, we have embarked on another exciting year for our employees, customers and shareholders. Recent events in California's power market reinforces the urgent need to bring power online quickly and efficiently. We expect to see heightened activity over the next several months as developers finalize project sites, negotiate contracts and move quickly into the construction phase of the project cycle."

31.    On April 11, 2001, the Individual Defendants caused the Company to announce its

financial results for the 2Q:01 ended February 28, 2001. The press release entitled, "The Shaw

Group Inc. Announces Solid Results for the Second Quarter of Fiscal 2001; Backlog Exceeds $3

Billion." The press release stated in relevant part:

16

*The Shaw Group Inc. today announced a 68% increase in earnings before an extraordinary item to $11.8 million, or $0.28 per diluted share, for the three months ended February 28, 2001*. This compares to earnings of $7.0 million, or $0.22 per diluted share, for the three months ended February 29, 2000. Sales increased 97% for the second quarter of fiscal 2001 reaching $340.3 million, compared to $173.0 million for the second quarter of fiscal 2000.

* * *

"With a backlog exceeding $3 billion and consistent financial results, we are extremely pleased with our current position," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "In the tremendously robust market that we are experiencing today, we have the utmost confidence in the success of our business model, and the value that it brings to all of our stakeholders."

32.     After this representation, Shaw Group common stock increased to over $60 per share.

33.     On April 26, 2001, the Individual Defendants caused the Company to announce that it had entered into an agreement to issue and sell $377 million worth of 20-year zero coupon Liquid Yield Option (TM) Notes (the "LYONs"). The press release entitled, "Shaw Sells $377 Million Zero Coupon Liquid Yield Option Notes," stated in relevant part:

J.M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, commented on the issuance of the LYONs. "In selecting LYONs, we decided to capitalize on the strong demand in the convertibles market as an opportunistic borrowing and leverage our strong financial position with relatively inexpensive capital at attractive terms while maintaining conservative financial ratios and a negative cost of carry. We believe it is advantageous to raise capital when market conditions are favorable in anticipation of future opportunities, even though we have no pressing need for the funds."

34.     Shaw Group received net proceeds of $490 million from the sale of the LYONs.

35.     Between May 1, 2001 and June 20, 2001, the Company's stock price dropped from $58 to $37 per share.

36.     On June 20, 2001, the Individual Defendants caused the Company to issue a press release stating that the Company expected continued earnings growth. The press release entitled, "Recent Market Activity in Shaw Stock," stated in relevant part:

The Shaw Group Inc. announced today that it knows of no specific reason internal to the Company for the recent decline in stock price over the past several days. *Additionally, the Company noted continued strength in margins and growing backlog*. Shaw expects to report third quarter results for 2001 on July 10. For the third quarter as well as the year ended August 31, 2001, the Company remains comfortable with current analysts' estimates for earnings, backlog and margins.

17

37.     On July 10, 2001, the Individual Defendants caused the Company to announce its

financial results for the 3Q:01 ended May 31, 2001. The press release entitled, "The Shaw Group

Announces Record Results for the Third Quarter of Fiscal 2001; Backlog exceeds $3.6 Billion,"

stated in relevant part:

> ***The Shaw Group Inc. today announced a 142% increase in earnings to $17.9
> million, or $0.42 per diluted share, for the three months ended May 31, 2001.*** This
> compares to earnings of $7.4 million, or $0.23 per diluted share, for the three months
> ended May 31, 2000. Third quarter fiscal 2001 sales increased 125% reaching $394
> million, compared to $175 million for the third quarter of fiscal 2000.
>
> * * *
>
> For the nine months ended May 31, 2001, the Company reported an increase in
> earnings before an extraordinary item to $41.9 million, or $1.00 per diluted share.
> This compares to earnings before a change in accounting principle of $20.2 million,
> or $0.67 per diluted share, for the nine months ended May 31, 2000. Sales for the
> nine months ended May 31, 2001 increased 131% to $1.2 billion, compared to $499
> million in sales for the nine months ended May 31, 2000.

38.     On September 5, 2001, the Individual Defendants caused the Company to announce

that it expected diluted earnings per share for its fiscal year ending August 31, 2002 to be in the

range of $2.15 to $2.25, exceeding the then-current First Call consensus estimate of $1.83 per diluted

share, and reaffirmed its "comfort" with analysts' First Call earnings consensus estimate of $0.44 per

diluted share for the 4Q:01.

39.     On October 9, 2001, the Individual Defendants caused the Company to announce its

4Q:01 and FY:01 financial results ended August 31, 2001. The press release entitled, "The Shaw

Group Inc. Announces Record Results for Fiscal Year 2001; Backlog Reaches $4.5 Billion," stated

in relevant part:

> The Shaw Group Inc. today announced an 89% increase in earnings to $19.3 million,
> or $0.45 per diluted share, for the three months ended August 31, 2001. This
> compares to earnings of $10.2 million, or $0.30 per diluted share, before an
> extraordinary item, for the three months ended August 31, 2000. Fourth quarter
> fiscal 2001 sales increased 46%, reaching $385.7 million, compared to $263.8
> million for the fourth quarter of fiscal 2000.
>
> For the year ended August 31, 2001, the Company reported a 101% increase
> in earnings to $61.2 million, or $1.46 per diluted share, before an extraordinary item.
> This compares to earnings of $30.4 million, or $0.99 per diluted share, before an
> extraordinary item and cumulative accounting change, for the year ended August 31,

18

2000. Sales for the year ended August 31, 2001 increased 102% to $1.5 billion, compared to $763 million in sales for the year ended August 31, 2000.

    "This has been an extraordinary year of achievement and growth for our Company," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our employees are to be commended for their success in placing us in a position to win. Beyond our record financial results, we are very pleased with the relationships we have formed with our customers and we are confident that they will provide a means for increasing shareholder value as they continue to develop and unfold over the next year."

40.    On November 29, 2001, the Individual Defendants caused the Company to file its FY:01 Form 10-K with the SEC in which it represented that its contracts acquired in connection with the Stone & Webster acquisition had been adjusted to "fair value":

    The Company acquired a large number of contracts with either inherent losses or lower than market rate margins primarily because Stone & Webster's previous financial difficulties had negatively affected the negotiation and execution of the contracts. These contracts were adjusted to their estimated fair value at acquisition date (July 14, 2000) and a liability (gross margin reserve) of $121,815,000 was established, including adjustments of $38,118,000 recorded during the one-year allocation period. The adjustment during the allocation period resulted from a more accurate determination of the actual contract status at acquisition date. The amount of the accrued future cash losses on assumed contracts with inherent losses (contract loss reserve) was estimated to be approximately $41,700,000 (including adjustments totaling approximately $5,400,000 recorded during the allocation period), and a liability of such amount was established. Both reserves are reduced as work is performed on the contracts and such reduction in the reserves results in a reduction in cost of sales and a corresponding increase in gross profit. Goodwill and deferred tax assets for the Stone & Webster acquisition were adjusted by $43,518,000 due to the revisions to the original reserve estimates identified during the allocation period.

41.    In late 2001, Shaw Group's stock declined from the mid-$30 range to the mid-$20 range in part due to events surrounding the collapse of Enron.

42.    On November 29, 2001, Merrill Lynch issued a report on Shaw Group to rebut the connection to Enron:

-     Shaw's stock has, once again, come under pressure coincident with bad news from Enron. This also happened in late October.

-     We're not entirely certain why the stock market trades Shaw this way. Shaw does not conduct business with Enron. If Enron's strategy has been to not own fixed assets, keep in mind that engineering & construction companies are involved solely with their customers' fixed assets.

-     Presumably, the market has sold Shaw off on this news along with other power-sector stocks, though Shaw's decline yesterday seemed

19

precipitous relative to others.

- It's also possible that investors fear that Shaw's customers (e.g., Mirant, Entergy, Exelon) might face financial consequences severe enough to shut down their capital spending as a result of being counterparties to energy trades with Enron.

- Such a wide-spread systemic failure of the US energy system sees a little far-fetched to us. The shares of Shaw's customers – i.e., the route of contagion in this scenario – do not currently seem to indicate that the market thinks such an outcome is likely.

43.    On January 14, 2002, the Individual Defendants caused the Company to announce

its 1Q:02 financial results. The press release entitled, "The Shaw Group Inc. Announces Increases

in Sales and Earnings for the First Quarter of Fiscal 2002," stated in relevant part:

The Shaw Group Inc. today announced a 56% increase in earnings to $19.0 million, or $0.45 per diluted share, for the first quarter ended November 30, 2001. This compares to $12.2 million in earnings, or $0.31 per diluted share, for the three months ended November 30, 2000. The Company also announced an increase in sales for the first quarter of fiscal 2002 to $453.6 million, representing an 8% increase over the prior year's first quarter sales of $418.8 million.

* * *

"The results of the first quarter are impressive given the events which occurred in September and the negativity that has saturated the power generation industry over the past several months," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "*We are confident that the need for additional power plants remains and that our customers will continue with their building plans*. Furthermore, with the Company's diversity in other markets, such as process and environmental and infrastructure, Shaw is positioned to quickly capitalize on new opportunities."

44.    On January 16, 2002, the Individual Defendants caused the Company to announce

that it had signed a letter of intent to acquire all of the assets and businesses of The IT Group, a

provider of diversified, value-added consulting, engineering and construction and remediation and

facilities management services, for cash and stock.

45.    A Merrill Lynch report on January 16, 2002 stated in part:

- Under this preliminary agreement, Shaw would pay about $105 million in cash and stock, plus assume some operating liabilities (but no debt). Shaw also plans to give IT up to a $75 million DIP loan during reorganization. That appears to be around 2x trailing EBITDA.

- At this price, the transaction would appear to be significantly

20

accretive.

\* \* \*

- We view this environmental market as slow-growth but also relatively steady, cash-cow sort of market with only modes operating risks. Most of the growth companies here do exhibit, as far as we've seen, larger players taking market share from smaller ones – which is one reason the industry has consolidated as much as it has.

46.     On April 15, 2002, the Individual Defendants caused the Company to announce its financial results for the 2Q:02 ended February 28, 2002.  The press release entitled, "The Shaw Group Inc. Announces Increases in Sales and Earnings for the Second Quarter of Fiscal 2002," stated in relevant part:

The Shaw Group Inc. today announced an 81% increase in earnings to $21.3 million, or $0.51 per diluted share, for the second quarter ended February 28, 2002. This compares to earnings before an extraordinary item of $11.8 million, or $0.28 per diluted share, for the three months ended February 28, 2001. The Company also announced an increase in sales for the second quarter of fiscal 2002 to $566.2 million, representing a 66% increase over the prior year's second quarter sales of $340.3 million.

\* \* \*

"Our results for the first six months of fiscal 2002 position us for another record year," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our backlog remains firm, and upon the successful completion of the acquisition of The IT Group, we look forward to a major expansion into the environmental, infrastructure and homeland security sector that will diversify our business and bring even greater certainty to our growth going forward."

For the six months ended February 28, 2002, the Company reported a 68% increase in earnings to $40.3 million, or $0.95 per diluted share. This compares to earnings before an extraordinary item of $24.0 million, or $0.58 per diluted share, for the six months ended February 28, 2001. Sales for the six months ended February 28, 2002 increased 34% to $1.0 billion, compared to $759.0 million in sales for the six months ended February 28, 2001.

47.     On April 23, 2002, the Individual Defendants caused the Company to announce it had received bankruptcy court approval to acquire The IT Group and that in conjunction with the acquisition of The IT Group, the Company expected to issue approximately 1.8 to 2.5 million shares of its common stock.  To further bolster the price of its stock, in anticipation of The IT Group acquisition, the Company revised its guidance for earnings per share for its fiscal year ending August

21

31, 2002 to increase in the range of $0.05 to $0.08, from its previous guidance of $2.15 to $2.25 per diluted share. The Company revised its earnings per share guidance for FY:03 to increase in the range of $0.25 to $0.33 from its previous guidance of $2.65 to $2.85 per diluted share.

48.     On May 3, 2002, the Individual Defendants caused the Company to announce it had completed the acquisition of substantially all of the assets of The IT Group in exchange for approximately $52.5 million in cash, approximately 1.67 million shares of Shaw Group common stock and the assumption of certain liabilities.

49.     On July 11, 2002, the Individual Defendants caused the Company to announce its financial results for the 3Q:02 ended May 31, 2002. The press release entitled, "The Shaw Group Announces Solid Results for the Third Quarter of Fiscal 2002," stated in relevant part:

> The Shaw Group Inc. today announced a 49% increase in earnings to $26.7 million, or $0.61 per diluted share, for the three months ended May 31, 2002. This compares to earnings of $17.9 million, or $0.42 per diluted share, for the three months ended May 31, 2001. Third quarter fiscal 2002 sales increased 129% reaching $902.6 million, compared to $394.2 million for the third quarter of fiscal 2001.

* * *

> "We are very pleased to report solid financial results on a consistent basis," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our strong balance sheet, project execution skills and ongoing strategy to diversify our portfolio of work have all played a key role in allowing Shaw Group to maintain its track record of growth. Additionally, the integration of our newly acquired assets in the environmental & infrastructure sector is progressing better than expected. We look for this division to be a major contributor to our success going forward."

50.     On July 11, 2002 Merrill Lynch issued a report on Shaw Group which stated in part:

- Operating profits were on-forecast, and the earnings outperformance versus our forecast came below the operating line. Revenues of $900 million were $100 million ahead of our forecast, but the operating margin of 4.8% was a bit below our forecast.

- Just as importantly, in our view, backlog was on-target at $6.1 billion, versus $3.621 billion last year and $4.478 at 2Q:02. This includes backlog acquired with the IT Group acquisition; IT and the rest of Shaw's Government business unit was the driver this growth.

51.     On August 5, 2002, the Individual Defendants caused the Company to announce it had been in discussions with NRG Energy, Inc. ("NRG") with respect to NRG's ability to make a $32

million milestone payment on the required date of August 4, 2002 on the $340 million LSP-Pike Energy, LLC electric power plant project, and that NRG would not make the next scheduled payment. The press release further stated that NRG and the Company had reached an agreement for Shaw Group to acquire substantially all the assets of NRG in exchange for forgiveness of current sums owed the Company, and the payment of $43 million by Shaw Group to NRG. However, the agreement was subject to the approval of NRG's parent Company, Xcel Energy, and certain of NRG's lenders.

52.     On October 14, 2002, the Individual Defendants caused the Company to announce its 4Q:02 and FY:02 results, including earnings of $98.4 million, or $2.26 per share for FY:02, compared to earnings of $61.0 million, or $1.46 per diluted share in FY:01. Shaw Group also reduced its FY:03 earnings estimate range from $2.72 to $3.00 per share to $1.92 to $2.08 per share. The press release entitled, "The Shaw Group Announces Financial Results for Fourth Quarter and Fiscal Year 2002," stated in relevant part:

> "Our strong balance sheet and project execution skills have allowed us to produce record results for another fiscal year," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Shaw's diversified portfolio, including our process and environmental & infrastructure operations, as well as our nuclear and other power services, provides a recurring revenue base and level of stability to our operations going forward."

> Shaw has completed the repurchase of approximately $100 million of its common stock, authorized by its Board of Directors on September 14, 2001, totaling approximately 5.3 million shares. This includes approximately 3.2 million shares purchased in the first of quarter of fiscal 2003, 1.0 million shares in the fourth quarter of fiscal 2002 and 1.1 million shares purchased in previous quarters.

53.     On January 13, 2003, the Individual Defendants caused the Company to announce its results for the 1Q:03 in a press release entitled, "The Shaw Group Announces Financial Results for First Quarter of Fiscal 2003." The press release stated in relevant part :

> The Shaw Group Inc. today announced earnings of $16.5 million, or $0.42 per diluted share, for the first quarter ended November 30, 2002. This compares to earnings of $19.0 million, or $0.45 per diluted share, for the three months ended November 30, 2001. Revenue for the first quarter of fiscal 2003 increased 120% reaching $996.9 million, compared to $453.6 million for the first quarter of fiscal 2002.

Shaw's backlog totaled $5.0 billion at November 30, 2002. This represents an 11% increase over the $4.5 billion backlog reported at November 30, 2001. Contributing to this backlog was approximately $457 million in new awards booked during the quarter, including approximately $220 million from the Company's environmental and infrastructure division. Approximately 47% of the total backlog, or $2.4 billion, is expected to be worked off during the next 12 months. Eighty-eight percent of Shaw's backlog is for projects in the United States.

"Strong bidding activity and steady bookings of new work highlight our first quarter operations and bring our fiscal year off to a good start," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our financial results for the quarter are solid, and we hope to continue this trend as we work off what we believe to be a stable and profitable backlog of projects. Furthermore, our environmental and infrastructure business is progressing at an impressive pace with significant new awards that help to confirm a successful integration effort."

54.     On March 18, 2003, the Individual Defendants caused the Company to announce that it had closed its private offering of $253 million face amount, 10.75% senior notes due 2010. Simultaneous with the closing of the transaction, the Company also completed the renewal of its $250 million revolving credit facility.

55.     On April 14, 2003, the Individual Defendants caused the Company to announce its results for the 2Q:03 in a press release entitled, "The Shaw Group Inc. Announces Financial Results for the Second Quarter of Fiscal 2003; Reached with NEG Resulting in $19 Million After-Tax Charge." The press release stated in relevant part:

The Shaw Group Inc today announced a loss of $7.9 million, or $0.21 per diluted share, for the second quarter ended February 28, 2003 after recording a $19 million after-tax charge relating to the settlement of claims with PG&E National Energy Group ("NEG") for the completion of the Harquahala and Covert power plant projects, the details of which were provided in a separate announcement released today. Earnings for the three months ended February 28, 2002 were $21.3 million, or $0.51 per diluted share.

Revenues for the second quarter of fiscal 2003 increased 27% to $720.5 million compared to the prior year's second quarter revenues of $566.2 million.

Shaw booked over $960 million in new awards during the second quarter, 50% of which were from the Company's environmental and infrastructure business. Backlog for the second quarter totaled $5.0 billion, compared to $4.5 billion reported at February 28, 2002, with approximately 90% of the total backlog relating to projects for the domestic market. Approximately $2.0 billion, or 40%, of total backlog is expected to be worked off during the next 12 months.

J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, commented, "In addition to our healthy bookings in the quarter, we continue to be

24

encouraged by the level of bidding activity across all business segments, which allows us to remain optimistic about our operations going forward. Furthermore, through the continued integration of our businesses we are realizing greater operational efficiencies and also leveraging our capabilities to broaden our customer base and bring greater value to our stakeholders."

56.    On July 11, 2003, the Individual Defendants caused the Company to announce its financial results for the 3Q:03 in a press release entitled, "The Shaw Group Announces Financial Results for the Third Quarter of Fiscal 2003; Company Takes $8.3 Million After-Tax Write Down." The press release stated in relevant part:

> The Shaw Group Inc. today announced earnings of $3.1 million or $0.08 per diluted share for the third quarter ended May 31, 2003 after recording an after-tax charge of $8.3 million. Excluding the charge, earnings for the period were $11.4 million or $0.30 per diluted share compared to $26.7 million, or $0.61 per diluted share for the three months ended May 31, 2002.
>
> The charge relates to the after-tax write-off of investments in marketable securities and accounts and claims receivable from Orion Refining Corporation (Orion) of $7.8 million and other receivables of approximately $500,000. Shaw provided construction services at Orion's Norco, Louisiana refinery in 1998. Orion declared bankruptcy on May 13, 2003. Given the bankruptcy filings, Shaw believes there is a minimal chance of recovery.
>
> Revenues for the third quarter of fiscal 2003 were $824.0 million versus $902.6 million in the prior year's third quarter. The decline in revenues for the quarter is primarily due to a downturn in the market for the construction of gas-fired power plants, partially offset by an increase in revenues generated by the Company's Environmental and Infrastructure division.
>
> Shaw booked approximately $500 million in new awards during the third quarter. Backlog for the third quarter totaled approximately $5.0 billion, comparable with the second quarter ended February 28, 2003, with approximately 91% of total backlog relating to projects for the domestic market. Approximately 40% of the company's backlog is expected to be completed within 12 months beginning May 31, 2003.
>
> J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, commented, "Weak demand for new power plant capacity in the U.S. has created a highly competitive marketplace, which has resulted in a more selective approach to securing work in this sector. We have identified numerous opportunities in air emissions and in nuclear maintenance and modifications. Additionally, we are pursuing the new EPC power projects including grassroots facilities in certain markets where capacity is needed. Our strong competitive position and performance track record in these segments bode well for our ability to capitalize on these projects."
>
> "We are also pleased with the robust bidding and booking activity for our Environmental and Infrastructure segment across all business lines, especially the

25

growing federal services platforms of Facilities Management and Military Housing Privatization," Bernhard concluded.

57.    In the press release Shaw Group also reduced estimates for 4Q:03 and FY:04.

58.    On October 16, 2003, the Individual Defendant caused the Company to announce its FY:03 results. In the press release entitled, "The Shaw Group Announces Financial Results for Fourth Quarter and Fiscal Yar 2003," the Company reported that, for FY:03, earnings were $20.9 million, or $0.54 per diluted share, compared to earnings of $98.4 million, or $2.26 per diluted share for FY:02. The Company blamed the relatively poor showing on weakness in the power generation market. The press release stated in relevant part:

> "There is no question that the protracted weakness in the power generation market and the subsequent financial instability of some of our energy clients presented challenges never before faced by our company," stated J.M. Bernhard, Jr., Chairman and Chief Executive Officer of The Shaw Group Inc. "However, I am extremely satisfied with the manner in which our organization has responded to these difficulties. We are pleased to report that with the near completion of the NEG projects and our recent settlement with NRG, we have made great strides in putting these negative issues behind us."

> Mr. Bernhard continued, "Furthermore, we have kicked off our new fiscal year with several major awards and we are experiencing strong booking and bidding activity, especially for fossil and nuclear power EPC and maintenance work."

59.    On October 20, 2003, the Individual Defendants caused the Company to file its annual report for the fiscal year ended August 31, 2003, in which it reiterated the results announced in its October 16, 2003 press release.

60.    On October 29, 2003, the Individual Defendants caused the Company to announce that it had completed the sale of 23 million shares of common stock at a public offering price of $10 per share. The underwriters exercised their option to purchase an additional 3 million shares.

61.    On January 14, 2004, the Individual Defendants caused the Company to announce its results for the 1Q:04 in a press release entitled, "The Shaw Group Announces Financial Results for First Quarter of Fiscal 2004." The press release stated in relevant part:

> The Shaw Group Inc. today announced financial results for its first quarter ended November 30, 2003. The Company reported a net loss of $49.6 million or ($1.07) per diluted share versus earnings of $16.5 million or $0.42 per diluted share for its first quarter ended November 30, 2002. Results reflect $74.2 million in pre-tax

26

charges taken during the quarter, including $44.8 million related primarily to increased costs on three power projects and a $29.4 million depreciation charge related to legacy software systems, which were successfully replaced by a new integrated systems platform.

* * *

Shaw's backlog totaled $5.1 billion at November 30, 2003, at 7% increase over the $4.8 billion recorded at August 31, 2003. Contributing to backlog during the quarter was over $1 billion in new awards and increases in scope to existing contracts. Maintenance contracts were $1.4 billion or 27% of total backlog and process work under contract expanded over 34% to $710 million at quarter end. Approximately 36% of total backlog, or $1.8 billion, is expected to be worked off during the next 12 months.

"We are disappointed with our operational performance, primarily from our ECM division, and with the fact that we had to take additional project-related write-downs during the quarter. However, we believe we have laid the groundwork for improved operational performance in the second half of 2004 and well into fiscal 2005," stated J. M. Bernhard, Jr. Shaw's Chairman and Chief Executive Officer. "Our confidence is supported by the healthy booking and bidding activity we experienced across all business segments during the quarter, including over $600 million in bookings by our Environmental and Infrastructure division and our Maintenance group, both of which provide a stable stream of revenues and earnings for the Company."

62.     On February 20, 2004, the Individual Defendants caused the Company to announce it had filed a shelf registration statement with the SEC to offer and sell up to $500 million of common stock, preferred stock or debt securities. The net proceeds generated from any future sale of securities would "be used for general corporate purposes." The press release entitled, "The Shaw Group, Inc. Files Shelf Registration for $500 Million in Debt and Stock," stated in relevant part:

"With our existing shelf nearly exhausted, we made this filing to continue to have the necessary mechanisms in place for facilitating the sustained growth of our company," stated Robert L. Belk, Executive Vice President and Chief Financial Officer. "It is our practice to maintain a shelf registration to give us the flexibility to effectively manage and expand our global operations and to pursue various opportunities essential for executing our strategic plan and increasing shareholder value."

63.     On April 14, 2004, the Individual Defendants caused the Company to announce its results for the 2Q:04, including income of $2.2 million, or $0.04 per diluted share, compared to a net loss of $7.9 million, or $(0.21) per diluted share, for the 2Q:03. The press release entitled, "The Shaw Group Announces Financial Results for the Second Quarter of Fiscal 2004,"stated in relevant

27

part:

> Primarily due to delays in the startup of two major EPC projects, the Company also announced that third quarter fiscal 2004 earnings are expected to be at the lower end of the range of its previously issued guidance, approximately $0.18 per diluted share, while fourth quarter earnings are expected to be below prior guidance, at approximately $0.28 per diluted share.

### THE TRUTH IS REVEALED AND THE COMPANY IS DAMAGED

64.     Then, on June 10, 2004, after the market closed, the Individual Defendants caused the Company to issue a press release entitled, "Shaw Group Reports Informal SEC Inquiry," on *Business Wire* in which it announced that, on June 1, 2004, it had been notified by the SEC that the SEC was conducting an informal inquiry.  The press release stated in relevant part:

> The SEC has not advised the Company as to either the reason for the inquiry or its scope. However, the request for information appears to primarily relate to the purchase method of accounting for acquisitions, as presented in Shaw's Form 10-K for the fiscal year ended August 31, 2003.

65.     On this news, shares of the Company's stock dropped from a closing price of $12.28 on June 10, 2004 to a closing price of $10.05 per share on the next trading day, June 14, 2004 on a volume of 4.2 million shares, nearly six times the daily average, and  representing a decline of over 18% and erasing over $136 million in the Company's market capitalization.

66.     As a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations of the nation's securities laws and regulations and has been named in numerous federal securities class action lawsuits filed in the United States District Court for the Eastern District of Louisiana, on behalf of investors who purchased Shaw Group's shares.  These lawsuits allege that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby.  These lawsuits will cost the Company millions to defend and tens of millions if not more to resolve.

67.     Moreover, the Individual Defendants caused the Company to accomplish two secondary offerings of Shaw Group stock, raising more than $215 million in net proceeds which will subject the Company to strict liability under Securities Act of 1933 by issuing a Registration

Statement and Prospectus in connection with the offering of the securities which contained untrue statements of material fact and omitted to state material facts necessary to make these statements not misleading.

68.     In addition, the Company's reputation, standing and goodwill in the investment community have been irreparably damaged. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Biopure's ability to raise capital – on favorable terms – will be impaired in the future.

## IMPROPER FINANCIAL REPORTING
## DURING THE RELEVANT PERIOD

69.     The Individual Defendants, particularly management and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal controls for Shaw Group and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required under GAAP, to:

(1)     Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)     Transactions are executed in accordance with management's general and specific authorization; and

(b)     Transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

70.     In addition, according to Appendix D to the Statement on Auditing Standards ("SAS") No. 55, management should consider, among other things, such objectives as: (a) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for

29

assets;" and (b) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

71.    According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

72.    In order to report inflated earnings, the Individual Defendants caused Shaw Group to record excessive reserves in connection with mergers and then draw down on those reserves into income and also caused the Company to record more revenue under the percentage-of-completion ("POC") method of accounting than it had earned, causing the Company's financial statements to be presented in violation of GAAP and SEC rules.

73.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

**Purchase Accounting**

74.    During the Relevant Period, Shaw Group's earnings were artificially inflated by the release of acquisition-related contract reserves into earnings, thereby inflating its results through manipulating "cookie-jar" reserves.

75.    In 2000, Shaw Group acquired Stone & Webster out of bankruptcy, and in May 2002 it acquired The IT Group out of bankruptcy. These two companies had existing unprofitable contracts. As part of the acquisitions, Shaw Group recorded reserves for future estimated losses on

the contracts and recorded the off-setting entry for the reserve as an increase in goodwill. Shaw Group has used these reserves to reduce cost of sales, distorting the true cost of contracts and artificially inflating its earnings.

76.     Shaw Group has now acknowledged that the SEC is investigating the Company's accounting for purchases.

**Percentage-of-Completion Accounting**

77.     In accounting for income from long-term construction type contracts, one method permitted under GAAP is the POC method. POC accounting is intended to recognize income as work progresses based on either the percentage of costs incurred divided by total estimated costs or the percentage of labor incurred divided by total estimated labor hours. *See* Accounting Research Bulletin ("ARB") No. 45, ¶4. An essential component of POC accounting is the ability to maintain a defensible and reasonable degree of accuracy in identifying both total labor costs and labor costs incurred. Recognition of revenue under POC accounting is not simply a matter of business judgment, but must be based on a comprehensive review of each individual contract, the actual costs or labor incurred and a "realistic estimate of costs [for labor] to complete all phases of the contract." *See* AICPA Manual at §8.10. Moreover, the mere purchase of generic raw materials, such as computer equipment, does not qualify as a labor cost incurred. *See* AICPA Statement of Position ("SOP") No. 81-1.50. According to GAAP, as set forth in AICPA SOP No. 81-1, POC income recognition is a specific methodology intended to present the accurate economic substance of a company's transactions. *See* SOP No. 81-1.22.

78.     The SEC has noted that "Percentage of Completion accounting requires that there be an *accurate* method to measure what portion of a job has been completed." SEC Accounting and Auditing Enforcement Release ("AAER") No. 356 (Mar. 2, 1992). The SEC has also brought enforcement actions for failure to properly recognize revenue under the POC method where a company's senior management recognized revenue in excess of the percentage of work performed as reported by the company's project manager. *See* AAER No. 274 (Sept. 26, 1990).

79.    The Individual Defendants represented to shareholders and the market that Shaw Group complied with GAAP and the Company's own POC accounting policy. Shaw Group's FY:03 Form 10-K represented that:

> For project management, engineering, procurement, remediation, and construction services under fixed-price or target price contracts, we recognize revenues under the percentage-of-completion method measured primarily by the percentage of contract costs incurred to date to total estimated contract costs for each contract.

80.    In truth, during the Relevant Period, the Individual Defendants did not comply with GAAP or Shaw Group's stated manner of recognizing revenue under POC accounting and artificially inflated its earnings by overstating the percentage of the contract completed.

81.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(b)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(c)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶12);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts

32

No. 1, ¶50);

        (e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

        (f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        (g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

        (h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

        82.     Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**ILLEGAL INSIDER SELLING**

        83.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Shaw Group stock:

33

| Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| J.M. BERNHARD, JR. | CEO | 7/24/2001 | 75,000 | $ 29.65 | $ 2,223,750.00 |
| | | 7/25/2001 | 75,000 | $ 33.75 | $ 2,531,250.00 |
| | | 7/26/2001 | 75,000 | $ 33.25 | $ 2,493,750.00 |
| | | 7/27/2001 | 30,000 | $ 35.02 | $ 1,050,600.00 |
| | | 1/16/2001 | 125,200 | $ 41.69 | $ 5,219,588.00 |
| | | 1/17/2001 | 304,800 | $ 42.47 | $ 12,944,856.00 |
| | | 1/18/2001 | 570,000 | $ 42.26 | $ 24,088,200.00 |
| | | 7/24/2001 | 75,000 | $ 29.65 | $ 2,223,750.00 |
| | | 7/25/2001 | 75,000 | $ 33.75 | $ 2,531,250.00 |
| | | 7/26/2001 | 75,000 | $ 33.25 | $ 2,493,750.00 |
| | | 7/27/2001 | 30,000 | $ 35.02 | $ 1,050,600.00 |
| | | | **1,510,000** | | **$58,851,344.00** |
| L. LANE GRIGSBY | D | 1/16/2001 | **16,000** | $ 41.65 | $ **666,400.00** |
| ALBERT D. MCALISTER | D | 4/25/2001 | 1,000 | $63.00 | $63,000.00 |
| | | 4/12/2001 | 1,800 | $56.78 | $102,204.00 |
| | | 4/12/2001 | 1,200 | $56.84 | $68,208.00 |
| | | 11/17/2000 | 5,600 | $41.25 | $231,000.00 |
| | | 11/17/2000 | 400 | $40.87 | $16,348.00 |
| | | | **10,000** | | **$480,760.00** |
| DAVID W. HOYLE | D | 4/25/2001 | 1,000 | $ 61.45 | $ 61,450.00 |
| | | 4/25/2001 | 900 | $ 61.45 | $ 55,305.00 |
| | | 4/25/2001 | 100 | $ 61.60 | $ 6,160.00 |
| | | 1/16/2001 | 8,000 | $ 41.13 | $ 329,040.00 |
| | | | **10,000** | | $ **451,955.00** |
| ROBERT L. BELK | CFO, VP | 1/16/2001 | **35,000** | $ 41.82 | $ **1,463,700.00** |
| RICHARD F. GILL | COO | 4/16/2002 | 20,000 | $ 30.25 | $ 605,000.00 |
| | | 1/17/2001 | 40,000 | $ 42.00 | $ 1,680,000.00 |
| | | | **60,000** | | $ **2,285,000.00** |
| MITCHELL A. RAYNER | VP | 1/16/2001 | **40,000** | $ 40.51 | $ **1,620,400.00** |
| | | **TOTAL** | **1,681,000** | | **$65,819,559.00** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.    Plaintiff brings this action derivatively in the right and for the benefit of Shaw Group

to redress injuries suffered, and to be suffered, by Shaw Group as a direct result of the breaches of

fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust

enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Shaw Group

34

is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

85.     Plaintiff will adequately and fairly represent the interests of Shaw Group in enforcing and prosecuting its rights.

86.     Plaintiff is and was an owner of the stock of Shaw Group during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

87.     The current Board of Shaw Group consists of the following eight individuals: Director Defendants Bernhard, McAlister, Grigsby, Hoyle, Sinders, Roemer, Barfield and Barker. In addition to the numerous and particularized reasons set forth in ¶¶13-20 above, plaintiff has not made any demand on the present Board of Shaw Group to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following additional reasons:

(a)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current members of the Shaw Group Board participated in the illegal insider selling:

(i)     Director Defendant Bernhard sold 1,510,000 shares for proceeds of $58,851,344.

(ii)     Director Defendant Hoyle sold 10,000 shares for proceeds of $451,955.

35

(iii)     Director Defendant McAlister sold 10,000 shares for proceeds of $480,760.

(iv)     Director Defendant Grigsby sold 16,000 shares for proceeds of $666,400.

(b)     The Compensation Committee of the Board determines, after consulting with the CEO, establishes, authorizes and administers Shaw Group's compensation policies, practices and plans for Shaw Group's directors, executive officers and other key personnel. The Compensation Committee is comprised of defendants McAlister and Roemer. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants McAlister and Roemer. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on Bernhard, Grigsby, Hoyle, Sinders, Barfield and Barker is futile;

(c)     The principal professional occupation of defendants Bernhard and Barfield are their employment with Shaw Group, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Specifically, for FY:03, FY:02 and FY:01, the Company paid Bernhard $950,000, $953,482 and $941,667 respectively in salary, and for FY:02 and FY:01 paid him $1,000,000 and $2,000,000, respectively in bonuses. Barfield, as an officer and director, also receives substantial salaries and bonuses. In addition, each are granted options to purchase Shaw Group stock. Accordingly, defendants Bernhard and Barfield lack independence from defendants McAlister and Roemer, who exert influence over defendants Bernhard and Barfield's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Bernhard and Barfield incapable of impartially

36

considering a demand to commence and vigorously prosecute this action;

(d)   According to Shaw Group's Proxy Statements filed with the SEC, Individual Defendants Sinder, Hoyle and McAlister served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of Shaw Group's internal auditors and independent accountants. The Audit Committee is responsible for the integrity of Shaw Group's financial statements, Shaw Group's compliance with legal and regulatory requirements, Shaw Group's system of internal accounting and financial controls, and the performance of Shaw Group's internal audit function. Nonetheless, the Audit Committee, with full knowledge of the Company's improper accounting practices recommended that the Board include the improper audited financial statements in Shaw Group's filings with the SEC during the Relevant Period without disclosing this material information. By such actions, these defendants breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(e)   The entire Shaw Group Board and senior management participated in the wrongs complained of herein. Shaw Group's directors are not disinterested or independent due to the following: Director Defendants Bernhard, McAlister, Grigsby, Hoyle, Sinders, Roemer, Barfield and Barker served on the Shaw Group Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Shaw Group and its shareholders in that they failed to prevent and correct the improper financials. Moreover, Director Defendants Bernhard, Grigsby, Sinders, McAlister and Hoyle all signed the Company's false and misleading Annual Reports on Form 10-K for FY:03, FY:02 and

37

FY:01 and Director Defendants Barfield and Roemer signed the Company's false and misleading Annual Reports on Form 10-K for FY:03. Thus, the Shaw Group Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Shaw Group to millions of dollars in liability for possible violations of applicable securities laws;

(f)     The Director Defendants of Shaw Group, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Shaw Group's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(g)     As detailed herein at ¶¶13-20 in order to bring this suit, all of the directors of Shaw Group would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand. As set forth in particularity in ¶¶13-20 because a majority of the Individual Defendants have long-term personal, professional and financial relationships with each other and other board members, a majority of the Director Defendants could not have adequately considered a demand to bring the allegations made herein rendering any such demand futile;

(h)     The acts complained of constitute knowing violations of the fiduciary duties owed by Shaw Group's officers and directors and these acts are incapable of ratification;

(i)     Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were

38

made available and distributed to shareholders, authorized and/or permitted the issuance of various

of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus

could not fairly and fully prosecute such a suit even if such suit was instituted by them;

        (j)     Any suit by the Director Defendants to remedy these wrongs would likely

expose the Individual Defendants and Shaw Group to further violations of the securities laws that

would result in civil actions being filed against one or more of the Individual Defendants; thus, they

are hopelessly conflicted in making any supposedly independent determination whether to sue

themselves;

        (k)     Shaw Group has been and will continue to be exposed to significant losses

due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits

against themselves or others who were responsible for that wrongful conduct to attempt to recover

for Shaw Group any part of the damages Shaw Group suffered and will suffer thereby;

        (l)     If the Director Defendants were to bring this derivative action against

themselves, they would thereby expose their own misconduct, which underlies allegations against

them contained in class action complaints for violations of securities law, which admissions would

impair their defense of the class actions and greatly increase the probability of their personal liability

in the class actions, in an amount likely to be in excess of any insurance coverage available to the

Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses

they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile;

and

        (m)     If Shaw Group's current and past officers and directors are protected against

personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty

alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Shaw Group.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiff asserts, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Shaw Group against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Shaw Group, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Shaw Group to sue them, since they will face a large uninsured liability.

88. Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Shaw Group for any of the wrongdoing alleged by plaintiff herein.

89. Plaintiff has not made any demand on shareholders of Shaw Group to institute this action since such demand would be a futile and useless act for the following reasons:

(a) Shaw Group is a publicly held company with approximately 61.18 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

40

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

87.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.     The Individual Defendants owed and owe Shaw Group fiduciary obligations. By reason of their fiduciary relationships, the defendants owed and owe Shaw Group the highest obligation of good faith, fair dealing, loyalty and due care.

89.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

90.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's financial condition and failed to correct the Company's public filings and press releases. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

91.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Shaw Group has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

92.     Plaintiff on behalf of Shaw Group has no adequate remedy at law.

## COUNT II

### Against All Defendants for Abuse of Control

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Shaw Group, for which they are legally responsible.

95.     As a direct and proximate result of the Individual Defendants' abuse of control, Shaw Group has sustained significant damages.

96.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

97.     Plaintiff on behalf of Shaw Group has no adequate remedy at law.

## COUNT III

### Against All Defendants for Gross Mismanagement

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     By their actions alleged herein, the Individual defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Shaw Group in a manner consistent with the operations of a publicly held corporation.

100.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Shaw Group has sustained significant damages in excess of tens of millions of dollars.

42

101.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

102.    Plaintiff on behalf of Shaw Group has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    As a result of the improper statements and nondisclosures, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Shaw Group to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend Individual Defendants' unlawful actions including responding the SEC's allegations and securities fraud actions.

105.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

106.    Plaintiff on behalf of Shaw Group has no adequate remedy at law.

## COUNT V

### Against All Defendants for Unjust Enrichment

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Shaw Group.

43

109.     Plaintiff, as a shareholder and representative of Shaw Group, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VI

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

110.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Shaw Group common stock on the basis of such information.

112.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Shaw Group common stock.

113.     At the time of his stock sales, the Insider Selling Defendants knew  that the Company's revenues were materially overstated and sold stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

114.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants fiduciary duties, the Company is entitled to the imposition

44

of a constructive trust on any profits they obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

      A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

      B.     Awarding to Shaw Group restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants including all illicit profits obtained by the Insider Selling Defendants;

      C.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      D.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

LEMMON LAW FIRM, LLC

**ANDREW A. LEMMON (#18302)**
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone: 985/783-6789
Facsimile: 985/783-1333

45

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
1010 Second Ave., Suite 2360
San Diego, CA  92101
Telephone:  619/525-3990
Facsimile: 619/525-3991

GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201
Telephone: 615/244-2202
Facsimile: 615/252-3798

Attorneys for Plaintiff

46

## VERIFICATION

I, Jeffrey P. Fink, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 8th day of July, 2004, at San Diego, California.


_____
JEFFREY P. FINK